UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-80106-CIV-MARRA/MATTHEWMAN

ROGER DALE CORBIN,

Plaintiff,

vs.

TOWN OF PALM BEACH,

Defendant.

_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendant Town of Palm Beach's Motion for

Summary Judgment (DE 28) and Plaintiff Roger Dale Corbin's Motion for Partial Summary

Judgment (DE 60).   The Court has carefully considered the Motions and is otherwise fully

advised in the premises.

I.  Background

Defendant Town of Palm Beach ("Defendant") is a Florida municipal corporation.

Plaintiff Roger Dale Corbin ("Plaintiff") was employed by Defendant in its Fire Rescue

Department as a firefighter/paramedic for approximately 17 years. (Apr. 9, 2013 Danielle Olson

Aff. ¶ 3, DE 33-1; Pl. Dep. 11-12, 19, Ex. E, DE 45.)  Initially, Plaintiff was a paramedic and

then he became a paramedic driver, which resulted in a pay raise and an increase in rank. (Pl.

Dep. 12.)  Plaintiff has been a diabetic throughout the majority of his career working for

Defendant, which was well-known. (Olson Aff. ¶ 4; Apr. 4, 2013 Kirk Blouin Aff. ¶ 2, DE 31-1.)

Plaintiff's physician cleared him for full work duty without restriction or accommodation and

Plaintiff never asked for an accommodation. (Olson Aff. ¶ 4; Certification to Return to Work,

Ex. 37, DE 36-4.)  Dr. Mohan Persaud, a physician employed by Defendant, states that, in his

position, Plaintiff's diabetes does not substantially limit him in any major life activities. (Persaud

Aff. ¶ 6, DE 87; <u>see also</u> Marlene Rizzolo Aff. ¶ 6, DE 88.)

The Fire Rescue Department has a 24/48 hour shift scheduled.  The

firefighter/paramedics are on duty 24 hours straight and then are off duty for 48 hours on a

rotating schedule.  They also had a "Kelly day" off approximately once every three weeks prior to

September 17, 2011. (Brodie Atwater Aff. ¶¶ 2-3, DE 34-1; Darrel Donatto Aff. ¶¶ 2-3, DE 35-

1; Blouin Aff. ¶¶ 4-5.)  Firefighters are allowed "Exchange On/Off" time, where they can

exchange duty days with other firefighters to extend their vacations or tend to other business

from time to time. (Atwater Aff. ¶ 4; Donatto Aff. ¶ 4; Blouin Aff. ¶ 6.)

According to Defendant, there is a Town-wide policy that employees must be home when

calling out sick- unless they otherwise report their whereabouts to the Town and get approval.

Under the Town's rules, Defendant can check on employees calling out sick to assure their

whereabouts.  (Olson Aff. ¶ 5; Atwater Aff. ¶ 5; Donatto Aff. ¶ 5; Blouin ¶ 7.)  The policy states

in pertinent part:

> When an employee is not able to report for work on account of injury or illness, the
> employee or a member of his/her household will notify the supervisor or department office
> by telephone or messenger as soon as it is determined that the employee will be absent from
> work, but no later than the start of his/her shift . . . Unless the employee's supervisor or
> department office is so notified, no sick leave will be approved except in unusual cases.
>
> The Town Clinic may be requested to send a nurse to call on the absent employee.  If such
> employee is not at home when the nurse calls, no sick leave will be approved except with the
> approval of the Town Manager.  The nurse will make a written investigation report to the
> Director of Human Resources and will submit a copy of the written report to the department
> director.

(Section 5-4.1 Employee Absence Report, 2010 Employee Personnel Manual, DE 45-1; Section 5-

4.1 Employee Absence Report, 2011 Employee Personnel Manual, Ex. 30, DE 36-3.)[1]

According to Defendant, the Town's policy also refers to and thereby incorporates specific departmental policies.  The Fire Rescue Department has a specific policy that an employee must be at home when calling out sick unless the employee otherwise notifies the department.  (Olson Aff. ¶ 6; Atwater Aff. ¶ 6; Donato Aff. ¶ 6; Blouin Aff. ¶ 8.)  The Fire Rescue Department's sick leave policy states in part:

Section 9-2.6 Activities While on Sick Leave

Prior to leaving their place of residence, employees on sick leave shall call their assigned station and notify the on-duty officer of their intended activity and/or destination.  This information shall be recorded in the station journal.

(Section 9-2.6 Fire Rescue Department policy, Ex. 32, DE 36-3.)

Plaintiff had been counseled previously for "tagging on" sick time either before or after another day off and "linking" sick days to vacation.  He had been warned previously that he was subject to a call from a supervisor or nurse to confirm a sickness.  (Donatto Aff. ¶ 7; Blouin Aff. ¶ 9; Nov. 14 Email, DE 33, DE 36-3.)  A record of this warning is reflected in the Fire Rescue Department's counseling journal which reads, in part, "I also advised him that he may be subject to a call at home or a visit from a supervisor and/or nurse to confirm the illness. He stated he understood." (Counseling Journal, Ex. 33, DE 36-3.)  The purpose of these policies is to enable the Town to detect abuse of paid sick time, where an employee reports in sick to "tag on" extra vacation or personal days.  (Olson Aff. ¶ 7; Atwater Aff. ¶ 7; Donatto Aff. ¶ 8; Blouin Aff. ¶ 10.)  Such sick leave abuse had been especially prevalent in the Fire Rescue Department and the prior Fire Rescue

---

[1] Plaintiff points out that Defendant is using the 2011 policy, which was after his employment with Defendant. With respect to this section of the policy, however, they are identical.

3

Chief had been lax in enforcing policies. (Olson Aff. ¶ 8; Donatto Aff. ¶ 9; Blouin Aff. ¶ 11.)

In January 2011, the prior Fire Rescue Chief was discharged. (Olson Aff. ¶ 9; Donatto Aff. ¶ 10; Blouin Aff. ¶ 12.) A new Director of Public Safety (Kirk Blouin) was appointed to head both the Fire Rescue and Police Departments. (Olson Aff. ¶ 10; Donatto Aff. ¶ 11; Blouin Aff. ¶ 13.) Shortly after his appointment to the position of director of public safety, Blouin met with all Fire Rescue shifts to discuss personnel matters.[2] He stressed his intent to enforce the sick leave policy and advised the personnel that he would send supervisors to check up on staff calling out sick to assure they were at home.[3] (Atwater Aff. ¶ 9; Donatto Aff. ¶ 14; Blouin Aff. ¶ 16.) During that meeting, Plaintiff inquired as to where this rule was written down. (Corbin Dep. 96, DE 45-5.)

Plaintiff worked August 1, 2011 for 24 hours - getting off at 8:00 a.m. on August 2. (Atwater Aff. ¶ 9; Donatto Aff. ¶ 14; Blouin Aff. ¶ 16.) Plaintiff was scheduled for time off (48 hours) for two days on August 2 and 3, 2011 and had a "Kelly day" off on August 4, making for three consecutive days off. (Atwater Aff. ¶ 10; Donatto Aff. ¶ 15; Blouin Aff. ¶ 17.) Plaintiff was scheduled to report back to work for "Exchange On" on Friday, August 5, 2011 and he was to report to work at 8:00 a.m. (Atwater Aff. ¶ 11; Donatto Aff. ¶ 16; Blouin Aff. ¶ 18.) Plaintiff had the following day (Saturday, August 6, 2011) off. (Atwater Aff. ¶ 12; Donatto Aff. ¶ 17; Blouin Aff. ¶ 19.)

On August 2, 2011, Plaintiff rented a car from Enterprise Rent-a-Car. (Rental Car

_____

[2] Blouin testified that he was unable to think of a specific policy that he changed as a result of taking on his position. (Blouin Dep. 7, Ex. G, DE 45-8.)

[3] Defendant generated a list of employees who were the top users of sick leave in the department and those employees were likely to get a home visit, although anyone could get a visit when they called out sick. (Atwater Dep. 11.)

Agreement, Ex. 38, DE 36-4.)  He and his family drove to his grandparents' house in Macon, Georgia. (Donatto Aff. ¶ 19; Blouin Aff. ¶ 21.)  The rental car agreement shows that Plaintiff intended to return the car on Saturday, August 6, 2011 at 11:00 a.m. (Rental Car Agreement.) Plaintiff testified that he planned to drive the rental car to work for his shift on Friday, and return it Saturday when he got off shift, because the rental car used less gas and was easier to drive than his SUV. (Pl. Dep. 145-46, DE 45-6.)  At 10:09 p.m. on August 4, 2011, Plaintiff was still in Macon, Georgia. (Donatto Aff. ¶ 21; Blouin Aff. ¶ 23.)  He remained there with his family until late Friday, August 5, because he was ill with a fever, stomach ache, vomiting and diarrhea, which was exacerbated by his diabetes, and the illness prevented the family from driving back to Florida. (Pl. Dep. 139-40; 147-48; 246-47.)  He had spent the entire Friday at Six Flags park. (Pl. Dep. 147.) Plaintiff then reported out "sick" for the following day (August 5) by way of an internet program, "Telestaff."[4] (Atwater Aff. ¶ 14; Donatto Aff. ¶ 22; Blouin Aff. ¶ 24; Pl. Dep. 139-40, 248-49.) Plaintiff did not call by telephone to report his whereabouts, notwithstanding that the battalion chief (immediate supervisor) was on duty for a 24 hour shift. (Atwater Aff. ¶ 15; Donatto Aff. ¶ 23; Blouin Aff. ¶ 25; Pl's Admissions ¶ 2.)  Plaintiff was not asked where he was and he did not report that he was in Macon, Georgia. (Atwater Aff. ¶ 16; Donatto Aff. ¶ 24; Blouin Aff. ¶ 26; Pl.'s Admissions ¶ 2; Pl. Dep. 247.)

On the day Plaintiff had called out sick, assistant chief Atwater conducted a verification visit to Plaintiff's residence. (Atwater Aff. ¶ 17; Donatto Aff. ¶ 25; Blouin Aff. ¶ 27.)  He arrived at Plaintiff's home at approximately 4:00 p.m. the afternoon of August 5, 2011.  He rang the doorbell

---

[4] There is no way to notify via Telestaff that Plaintiff was not at his home. (Pl. Dep. 248-49.)

and no one answered. (Atwater Aff. ¶ 18; Donatto Aff. ¶ 26; Blouin Aff. ¶ 28.)  Atwater called

Plaintiff's cell phone and did not receive an answer.  He left a message for Plaintiff to call him.

(Atwater Aff. ¶ 19; Donatto Aff. ¶ 27; Blouin Aff. ¶ 29.)  Plaintiff never listened to those messages

until after being placed on administrative leave/suspension. (Pl.  Dep 153, 247-48, 252.)  Atwater

then called the Town to get Plaintiff's wife cell phone number and called that number at 4:40 p.m.

(Atwater Aff. ¶ 20; Donatto Aff. ¶ 28; Blouin Aff. ¶ 31.)  Plaintiff's wife answered the telephone and

told Atwater that she had just arrived home and that Plaintiff was at home, sick and asleep.  (Atwater

Aff. ¶ 21; Donatto Aff. ¶ 28; Blouin Aff. ¶ 31.)  Atwater then requested to speak with Plaintiff.

(Atwater Aff. ¶ 22; Donatto Aff. ¶ 30; Blouin Aff. ¶ 32.)

According to Defendant, when Plaintiff answered the telephone, Atwater told Plaintiff he had

been trying to reach him and Plaintiff responded that he must have been in the bathroom or sleeping.

(Atwater Aff. ¶ ¶ 22-23; Donatto Aff. ¶ 31; Blouin Aff. ¶ 33.)  Atwater advised Plaintiff he was in

Plaintiff's driveway and directed him to come to the door or window so that he could verify that

Plaintiff was home. (Atwater Aff. ¶ 24; Donatto Aff. ¶ 32; Blouin Aff. ¶ 34.)  Plaintiff replied, "I

cannot do that." (Atwater Aff. ¶ 25; Donatto Aff. ¶ 33; Blouin Aff. ¶ 35.)   Plaintiff then "clicked

off" the telephone.  Atwater called back on Plaintiff's wife's telephone and left a message for

Plaintiff to call him back, but he did not call him back. (Atwater Aff. ¶ 26; Donatto Aff. ¶ 34; Blouin

Aff. ¶ 36.)  Atwater reported Plaintiff's behavior to the director of public safety who ordered Palm

Beach detectives to monitor the home to determine if Plaintiff was home.  The first detectives

reported to the house at 6:30 p.m. on August 5, 2011 and were later relieved by other detectives.  The

house stayed under surveillance until Plaintiff returned the following day - August 6, 2011. (Atwater

Aff. ¶ 27; Donatto Aff. ¶ 35; Blouin Aff. ¶ 37.)  On Saturday, August 6, 2011, Atwater visited

Plaintiff's home at 11:40, knocked on the door and rang the doorbell but got no response.  He again tried to contact Plaintiff on his and his wife's telephone, leaving messages to return his call.  Plaintiff did not answer the telephone and never called back.  (Atwater Aff. ¶ 28; Donatto Aff. ¶ 36; Blouin Aff. ¶ 38.)

According to Plaintiff, he was asleep when Atwater called his telephone and, when he called his wife's telephone, she put him on the line.  Atwater identified himself and stated that he was outside his home and asked him to come to the door.  Plaintiff said, "no."  Atwater then asked him to shake a blind and Plaintiff again said "no."  (Pl. Dep. 151.)  Plaintiff states he was not asked where he was. (Pl. Dep. 247.)  Plaintiff also states that the telephone just got disconnected. (Pl. Dep. 153.)  He did not listen to any of his wife's voicemails. (Pl. Dep. 154.)  Plaintiff did not receive any orders to call Atwater back prior to being suspended.[5]  (Pl. Dep. 247, 252.)

At approximately 8:45 p.m. on August 6, Plaintiff's wife and their two children drove into the place of residence, without Plaintiff.  Plaintiff's wife told detectives that Plaintiff had been home sick for two days straight. (Donatto Aff. ¶ 37; Blouin Aff. ¶ 39.)  Plaintiff came out of his home and asked why the police were at his house.  Plaintiff told them he had been home sick, but was now feeling better. (Donatto Aff. ¶ 38; Blouin Aff. ¶ 40.)  Later, during the administrative investigation, he stated that his wife dropped him off on the block behind his house, and he cut through rear properties to enter his home from the rear. (Corbin Admissions ¶ 14, DE 37-1.)  Plaintiff stated that while he was driving back from Georgia, he remembered a party at a park behind his house and he

---

[5]   Atwater testified that it was not typical to send the police to an employee's house when they are sick. (Atwater Dep. 28, Ex. F, DE 45-7.)  Blouin testified that it was the first time Atwater had contacted him while he was at an employee's residence. (Blouin Dep. 19, Ex. G, DE 45-7.)

decided he wanted to go.  His wife dropped him off on the block behind the house.  He had recovered and was well enough to attend the party and decided to go there at 8:45 pm, rather than going home with his wife and children upon the return from Georgia.  (Donatto Aff. ¶ 39; Blouin Aff. ¶ 41.)

After receiving an initial report from Atwater, Blouin ordered a final administrative investigation. (Donatto Aff. ¶ 40; Blouin Aff. ¶ 42.)  Plaintif was afforded notice of the investigation and placed on administrative leave. (Donatto Aff. ¶ 41; Blouin Aff. ¶ 43.)  The investigation was conducted by Deputy Chief Darrel Donatto.  During the investigation, sworn statements were taken of 15 witnesses., including Assistant Chief Atwater, Plaintiff, Lieutenant Joseph Sekula, Battalion Chief Jason Weeks, Joseph Guellia, Lieutenant Donald Taylor, Palm Beach Detectives Nicholas Corisco, Brian Wilkins and Adam Pena. They were transcribed and made part of the investigation report. (Donatto Aff. ¶ 42; Blouin Aff. ¶ 44.)  The stated purpose of the investigation was to determine whether Plaintiff falsely reported use of sick leave, failed to follow proper procedures and was intentionally deceptive and insubordinate when questioned by a superior regarding his use of sick leave. (Donatto Aff. ¶ 43; Blouin Aff. ¶ 45.)

During the investigation, Plaintiff was asked to provide his car rental agreement to prove whether or not he had planned on staying for an extra day in Georgia as a "tag on" or "link" to his trip.  He was also asked to provide his and his wife' cell phone records to prove the call activities at different points in time when he did not answer Atwater's calls.  He refused to provide the cell phone records and claimed to have lost his rental agreement.  The rental contact was later obtained during the proceeding and showed that the car was rented through Saturday, August 6, not Thursday August 4, 2011. (Car rental agreement.)  Plaintiff acknowledged that he did not call Atwater back

and that he exhibited poor judgment and behaved suspiciously. (Corbin Admissions ¶ 11.) Plaintiff knew the rule about calling out sick if he was not at home. (Corbin Admissions ¶ 6.)

Based on the witness statements and documents reviewed during the investigation, Deputy Chief Donatto made findings against Plaintiff in violation to Town and Department rules, insubordination and deception for not reporting his whereabouts when calling out sick and being intentionally deceptive and insubordinate to his superior and the detectives regarding his use of sick leave. (Donatto Aff.¶ 45; Blouin Aff. ¶ 47.) The full report was given to Director Blouin with the investigative findings and all documentation. (Donatto Aff. ¶ 46; Blouin Aff. ¶ 48.) Based on the report, Director Blouin determined that Plaintiff was deceptive and dishonest concerning his whereabouts, had violated the Town policy in failing to reveal he was not at home and was insubordinate in hanging up on the Assistant Chief and not returning his telephone calls. (Blouin Aff. ¶ 49.) Blouin then issued a pre-disciplinary Notice of Intent to Discipline, advising that he intended to terminate Plaintiff's employment but gave him an opportunity to make a statement. (Blouin Aff. ¶ 50; Notice of Intent to Discipline, Ex. 24, DE 36-3.) In response, Plaintiff provided a letter statement to Blouin, addressing health issues involving his diabetes, claiming that the health issue that he encountered in Georgia involved this condition. (Pl. letter statement, Ex. 26, DE 36-3.) Plaintiff did not report a need for an accommodation to Blouin. (Blouin Aff. ¶ 53.) According to Defendant, after the pre-disciplinary meeting, Blouin made the decision to discharge Plaintiff based on his belief of policy violations, deceit and insubordination and that Plaintiff's conduct had nothing to do with his diabetes. (Blouin Aff. ¶ 52; Notice of Termination, Ex. 27, DE 36-3.) According to Plaintiff, he had a fever, his stomach hurt, he was achy, had diarrhea and was vomiting. (Pl. Dep. 139-40, 147-48.) These were typical symptoms since he had diabetes and these symptoms are hard

to regulate with his insulin pump.[6] (Pl. Dep. 246-47.)

Following the discharge, Plaintiff appealed to the Town Manager Peter Elwell and was given another hearing in accordance with Town rules and the union contract. (Elwell Aff. ¶ 12.)  Elwell made findings of dishonesty and insubordination and found the discharge had nothing to do with Plaintiff's disability.  (Elwell Aff. ¶ 13-14; Town Manager's determination, Ex. 29, DE 36-3.)

The Town has a policy found at section 7-16 of the personnel manual which allows for reasonable accommodations for disabilities and requires employers to make requests to the Human Resource department. (Olson Aff. ¶ 11.)  At no time did Plaintiff report a need for accommodation and his doctor certified that he did not need any accommodation. (Olson Aff. ¶ 12; Certificate to Return to Work, Ex 37, DE 36-4.)  A 2011 annual appraisal indicates that Plaintiff took four days of "family sick" and three days of "self sick." (Appraisal, Ex. 36, DE 36-3.)

Firefighter/paramedic Danny Gargiulo was suspended for two shifts because he took a sick day and when Atwater came to his house, he was not there. (Gargiulo Dep. 7, Ex. H, DE 45-9.) Former firefighter/paramedic Andrea Del La Riva received a written reprimand for calling out sick and not being at home when the chief came to her house. (Del La Riva Dep. 5-6, Ex. K.)  According to Blouin, Gargiulo was truthful about his rule violation and had not been deceitful. (Suppl. Blouin Aff. ¶ 2, DE 32-1.)  Del La Riva did not lie and was not insubordinate. (Suppl. Blouin Aff. ¶ 4.) Gargiulo's letter of suspension stated that Blouin had "great concerns about [his] judgment and actions," that he found his explanations to be unacceptable and his actions inexcusable, he failed to

---

[6] The town physician stated that the rule requiring employees to call in their whereabouts when leaving home while out on sick leave has no different impact on a person who is a diabetic in compared to non-diabetics. (Persaud Aff. ¶ 7.)

accept responsibility or "see the error of his ways." (Notice of Suspension, Ex. 42, Ex 36-4.) Plaintiff's letter stated in part that his behavior was a "clear example of errors in judgment, poor decision-making, actions not appropriate for a firefighter" and that he committed a direct violation of orders and Town policies set forth in the Notice of Intent to Discipline. The letter also stated that Blouin was concerned that Plaintiff was unable to accept responsibility for his actions and that he had continued poor judgment. (Notice of Termination, Ex. 27, DE 36-3.)  The punishment for Del La Riva was decided by the prior fire chief. (Suppl. Blouin Aff. ¶ 4.)

Both parties have filed motions for summary judgment.  Defendant seeks summary judgment on the disparate treatment claim and Plaintiff seeks summary judgment on the disparate impact claim.  With respect to the disparate treatment claim, Defendant states that its reasons for Plaintiff's discharge are legitimate business reasons and Plaintiff offers no evidence of pretext.  In response, Plaintiff contends that he was treated differently than similarly situated non-disabled employees. Plaintiff also contends that there is evidence of pretext, including the absence of a policy that allows for anyone other than the town nurse to visit the home of employee, contacting an employee's wife or conducting surveillance.  Plaintiff asserts that he did not violate section 9.2-6 of the sick leave policy because his "residence" during the time he was on sick leave was his grandparent's home, not his home.

Plaintiff's motion for partial summary judgment seeks a ruling that Defendant's sick leave policies has a disparate impact on disabled individuals.  Specifically, Plaintiff states that the sick leave policy uses criteria and tends to screen out disabled persons where the criteria is not job related and based upon business necessity.  In making this argument, Plaintiff asserts that he is a qualified individual with a disability, that the town's policy screened out Plaintiff from using a benefit to

11

which he was entitled, and that Defendant failed to establish that the sick leave policy was necessary to ensure the health or safety of others.

### II.  Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant  is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  <u>Anderson</u>, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." <u>Anderson</u>, 477 U.S. 242, 249-50.

III.  Discussion

A. Disparate Treatment Claim

A plaintiff may establish a prima facie case of discrimination under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C.A. § 12102(4)(E)(i) (2009)  through circumstantial evidence under the framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804 (1973).  <u>See</u> <u>Diehl v. Bank of America, N.A.</u>, 470 F. App'x 771, 775 (11th Cir. 2012); <u>Holly v. Clairson Industries, LLC</u>, 492 F.3d 1247, 1255 (11th Cir. 2007); <u>Coker v. Enhanced Senior Living, Inc.</u>, 897 F. Supp. 2d 1366, 1376 (N.D. Ga. 2012) (N.D. Ga. 2012).

Under that framework, the plaintiff must "create an inference of discrimination through his prima facie case."  <u>Vessels v. Atlanta Independent School System</u>, 408 F.3d 763, 767 (11th Cir. 2005). If a prima facie case has been shown, then the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>see</u> <u>Alvarez v. Royal Atlantic Developers, Inc.</u>, 610 F.3d 1253, 1264 (11th Cir. 2010)  The defendant's burden is one of production; it need not persuade the court that it was actually motivated

13

by the proffered reasons. See Chapman v. A1Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (internal citations and quotations omitted); see also Alvarez, 610 F.3d at 1264.

If the defendant satisfies the burden of production, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action. See Chapman v. A1Transport, 229 F.3d 1012, 1024 (11th Cir. 2000); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); Alvarez, 610 F.3d at 1264 ("[s]howing only that the employer's proffered reason is false does not necessarily entitle a plaintiff to get past summary judgment" because "the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against [him]").

A plaintiff establishes a prima facie case of ADA discrimination by showing that he has (1) a disability; (2) was qualified to perform the job and (3) was discriminated against based upon that disability. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004); Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002). Here, with respect to Defendant's motion for summary judgment on the disparate treatment claim, Defendant does not challenge the first two prongs of the prima facie case. Instead, Defendant claims the comparators offered by Plaintiff do not, as a matter of law, demonstrate discrimination on the basis of disability. Next, Defendant asserts that its reasons for terminating Plaintiff (i.e., violation of sick leave policy, insubordination and deceitfulness) were legitimate and there is no record evidence that those reasons

were pre-textual.

With respect to the comparator evidence, Plaintiff points to two other employees who violated the sick leave policy by not being at home when reporting in sick, Gargiulo and Del La Riva, who received a suspension and reprimand, respectively.  Neither were terminated.  With respect to this element of the prima facie case, the plaintiff must show that " 'the employees are similarly situated in all relevant aspects . . . In determining whether employees are similarly situated . . . it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" Knight v. Baptist Hosp., Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam) (quoting Holifield, 115 F.3d at 1562); see also Burke-Fowler, 447 F.3d at 1323 (it is required that the quantity and quality of the comparator's conduct be nearly identical); Osram Sylvania, Inc. v. Teamsters Local Union 528, 87 F.3d 1261, 1265 (11th Cir. 1996) ("Disparate treatment exists when similarly situated workers are treated differently even though they have committed similar acts."); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1186 (11th Cir. 1984) ("If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.") (citations and internal quotations omitted).

Here, Del La Riva was disciplined by the former fire chief and there is no record evidence that she had been dishonest or deceptive.  While Gargiulo violated the rule about not being home while sick, he admitted doing so.  Even under Plaintiff's version of the facts, his behavior can only be seen as insubordinate and deceitful.  Plaintiff refused to go outside to talk to Atwater or tell him he was not at home.  When the detectives were at his home, Plaintiff entered his home from the rear, claiming he had recovered from his illness and was returning from a neighborhood party.

The failure to identify incidents involving the same conduct with the same supervisor

regarding a similar work rule is fatal to establishing a prima facie case.   See Silvera v. Orange
County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) ("in order to satisfy the similar offenses
prong, the comparator's  misconduct must be nearly identical to the plaintiff's in order to prevent
courts from second-guessing employers' reasonable decisions and confusing apples with oranges.")
(quoting Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir.1999) (internal citation and quotation
marks omitted)).   See id. ('[t]he most important factors in the disciplinary context are the nature of
the offenses committed and the nature of the punishments imposed"); Hawkins v. Ceco Corp., 883
F.2d 977, 985 (11th Cir. 1989) (disciplinary measures given for violation of different work rules not
comparable).   The Court finds, as a matter of law, that Plaintiff has not shown that the comparators
were similarly situated.

        Turning next to Defendant's proffer of a legitimate business reason for terminating Plaintiff,
the record shows that the there is a Town-wide policy that employees must be home when calling
out sick- unless they otherwise report their whereabouts to the Town and get approval.   Under the
Town's rules, Defendant can check on employees calling out sick to assure their whereabouts.
The Fire Rescue Department also has a specific policy that an employee must be at home when
calling out sick unless the employee otherwise notifies the department.   It is undisputed that Plaintiff
failed to report he was not at home when he called out sick.   Nor is there a dispute that Plaintiff was
not at home when Atwater conducted his first verification visit.   When Atwater spoke to Plaintiff
on the telephone outside his home, even Plaintiff testified that he refused to come outside or shake
a blind to indicate he was home.   Although Plaintiff testified he was not asked where he was,
Atwater was clearly trying to determine whether Plaintiff was home.   To be sure, the parties disagree
whether Plaintiff hung up on Atwater or the call was disconnected, but there is no dispute that

16

Plaintiff knew that Atwater was trying to reach him.  Despite that, Plaintiff did not call him back. While Plaintiff makes much of the fact that he did not listen to the voicemails, that fact is of little import. Defendant was certainly entitled to draw the conclusion, based on Plaintiff's behavior, that Plaintiff was being deceptive and refusing to follow commands as required in a paramilitary organization.  See Cooper v. Southern Co., 390 F.3d 695, 740 (11th Cir. 2004), overruled on other grounds, Ash v. Tyson Foods, Inc., 546 U.S. 454, 457(2006) (finding that when an employer believed an employee had falsified a computer entry, the relevant issue is not whether the employee actually falsified the record, but rather whether the employer honestly believed the employee falsified the entry).

Moreover, the decision to terminate Plaintiff was done with numerous procedural safeguards, which mitigate against any potential alleged bias Atwater may have had against Plaintiff as a diabetic.  Donatto, as Deputy Fire Chief, conducted a full administrative investigation, complete with evidence and numerous witnesses.  The evidence was later reviewed by Blouin, the Director of Public Safety.  Lastly, the town manager conducted his own hearing where he made his own independent findings.  These numerous levels of reviews ensured that Plaintiff was not terminated because of Atwater's alleged bias.  See Pennington v. City of Huntsville, 261 F.3d 1262, 1270 (11th Cir. 2001) ("Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee.") .

Based on this evidence, the Court finds that Defendant has met its burden of production with respect to establishing a non-discriminatory legitimate business reason for terminating Plaintiff.  See Jenner v. Bank of America Corp., 304 F. App' x. 857, 859-60 (11th Cir. 2009) (multiple violations of policy constitute legitimate business reason for termination); Odum v. Government Employees

Ins. Co., No. 8:08-cv-1282-T-24-EAJ , 2009 WL 2134918, at * 4 (M.D. Fla. July 13, 2009) (violation of attendance policy and dishonesty are legitimate reasons for termination).

As such, the burden now shifts to Plaintiff to produce evidence that the reason for his termination was not the violation of the sick leave rule, insubordination and deceitfulness, but instead is a pretext for discrimination. See Alvarez, 610 F.3d at 1264. To show pretext, Plaintiff "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. at 1265 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997)).  Plaintiff may satisfy this burden either "by offering evidence that [Defendant] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible, unless the record conclusively shows that the real motive was a non-proffered reason that is non-discriminatory." Id.

Plaintiff argues that it was contrary to Defendant's policies and procedures for anyone other than the Town nurse to visit his home or to contact his wife.  He also claims that he did not violate the sick leave rule because he got sick in Georgia and therefore did not leave his residence when sick and that his "residence" was therefore his grandparents' house in Georgia.  Furthermore, Plaintiff contends he was singled out for a verification visit and received greater scrutiny because of his diabetes.

Plaintiff's interpretation of the Fire Rescue's sick leave rule does not create a genuine issue of material fact nor does it demonstrate pretext.  The Fire Rescue's sick rule reads:

> Prior to leaving their place of residence, employees on sick leave shall call their assigned station and notify the on-duty officer of their intended activity and/or destination.  This information shall be recorded in the station journal.

18

(Section 9-2.6 Fire Rescue Department policy.)

The record evidence demonstrates that Fire Rescue Department has had chronic problem with employees abusing the sick leave policy in order to link a sick day to vacation or personal days.  As a result, this rule exists to require employees to be home when sick, unless they otherwise tell the Fire Rescue Department of their whereabouts.  In an effort to show pretext, Plaintiff suggests an interpretation of this rule not based on any record evidence; namely, that his residence was Georgia and not his home in Florida because he became sick in Georgia and that therefore he did not leave his residence when he became sick.  Putting aside what would be the purpose of a sick leave rule with Plaintiff's interpretation, Plaintiff's interpretation is not based on any record evidence and is nothing more than conjecture and speculation.  See Bald Mountain Park Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989) ("Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment.").  Merely by offering a novel interpretation of the Fire Rescue Department's policy, he has not shown that Defendant acted with a discriminatory motive by finding that Plaintiff did not comply with the sick leave policy. See Chapman, 229 F.3d at 1024 (at the pretext stage, "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.").

Equally unpersuasive is Plaintiff's argument that he has shown pretext by pointing to the method used by Defendant in conducting the verification visit.  Plaintiff claims that it was improper for Defendant to send anyone other than a Town nurse to verify he was home when he called out sick.  There is, however, nothing in the policy that prohibits a department supervisor from

19

conducting the verification visit.  Furthermore, the record evidence demonstrates that, shortly after his appointment to the position of Director of Public Safety, Blouin met with all Fire Rescue employees and informed them that he would send supervisors to check up on staff calling out sick to assure they were at home.  Likewise, there is no prohibition on calling Plaintiff's wife when trying to locate him.  Calling Plaintiff's wife can hardly be seen as pretextual when, under Plaintiff's version of the facts, Atwater was outside his home, Plaintiff refused to come outside or indicate he was home, and their telephone call was disconnected.

Lastly, the comparator evidence showed that Defendant did not single Plaintiff out by conducting a verification visit.  The other two comparators, who were not diabetic, also received verification visits from supervisors.  Significantly, the record shows that Plaintiff was considered a serial sick leave abuser along with other employees, thus justifying the need for a verification visit. Indeed, Plaintiff had received a warning about his sick leave abuse prior to this incident.  While it is true that Defendant did not send the police to keep watch on the comparator's homes, Plaintiff's behavior was more suspicious than the comparators (e.g., the telephone disconnecting during his conversation with Atwater, his failure to return telephone calls or come outside when asked.)  The Court finds that there is reasonable support for Defendant's decision to send the police to Plaintiff's home and that action does not demonstrate Defendant's actions were pretextual.  See Chapman v. A1 Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (courts should not second guess the business judgment of the employer).

For these reasons, the Court finds that Plaintiff has not met his burden of raising a genuine issue of material fact that Defendant's legitimate, non-discriminatory reason was a pretext for unlawful discrimination.  Accordingly, Defendant's motion for summary judgment is granted.

B.  Disparate Impact Claim

The United States Supreme Court has recognized that disparate impact claims are cognizable under the ADA.  Raytheon Co. v. Hernandez, 540 U.S. 44, 53 (2003) (citing 42 U.S.C. § 12112(b)). These types of claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  Id.  The ADA prohibits employers from using policies which "screen out" disabled individuals unless the criteria "is shown to be job-related for the position in question and is consistent with business necessity."  42 U.S.C. § 12112(b)(6).  Besides pointing to a specific employment practice that allegedly has a disparate impact, a plaintiff must also demonstrate causation by offering statistical evidence to show that the challenged practice has resulted in prohibited discrimination.  Hallmark Developers v. Fulton County, 466 F.3d 1276, 1286 (11th Cir. 2006); Spivey v. Beverly Enterprises, Inc., 196 F.3d 1309, 1314 (11th Cir. 1999).  Once a prima facie case is established, the employer can respond with evidence that the challenged practice is both related to the position in question and consistent with business necessity.  Spivey, 196 F.3d at 1314.

In moving for summary judgment, Plaintiff argues that he is a qualified individual with a disability and Defendant's policies screened him from using a benefit to which he was entitled, and that Defendant failed to establish that sick leave policies were necessary to ensure the health and safety of others.

The Court will assume, without deciding, that Plaintiff is a qualified individual with a disability.   The Court finds Plaintiff has not met his burden on summary judgment in showing that the Fire Rescue Department policy "screens out" diabetics by requiring them to be home when ill. Another reading of the rule, and supported by record evidence, is that employees must call and

21

explain where they are and why they are not at home.  The rule does not say that they must be at home when they call.  While the Town's rule permits a verification visit to an employee who is out sick, that rule also states that no paid sick leave would be approved if the employee is not at home, except with the approval of the Town Manager.   In other words, as long as the employee calls and informs his or her department that he or she is  not at home and why, there would be no verification visit and paid sick leave would be approved.  There is also record evidence that verification visits were used for chronic sick leave abusers.  Plaintiff has not shown, as a matter of law, that the verification visits were being used against diabetics as opposed to chronic sick leave abusers.

Nor has Plaintiff shown how this rule impacts diabetics differently.  Plaintiff does not suggest that his diabetes renders him incapable of reporting in sick. In fact, Plaintiff chose to report in sick via Telestaff (on the computer), a method which allowed him to avoid advising Defendant of his whereabouts.  Nor is there any record evidence that indicates the rule prevents diabetics from using their sick leave benefits.  Moreover, had this rule harmed Plaintiff, Defendant had a policy to allow employees to request a reasonable accommodation, which Plaintiff did not do.  Cf. Bradley v.  Little Rock  Wastewater  Utility, 517  F.  App'x  530,  533  (8th  Cir.  2013)  (employer  had  no  duty  to accommodate employee when employer had no notice that employee sought an accommodation).  Additionally, Plaintiff has not submitted any statistical evidence that the Court could consider to make a determination on the issue of causation.  See N.A.A.C.P v. North Hudson Regional Fire Rescue, 665 F.3d 464, 476 (3d Cir. 2011) (disparate impact prima facie case requires the plaintiff to show a significant statistical disparity); Bennett v. Nucor Corp., 656 F.3d 802, 817 (8th Cir. 2011) (same).

Lastly, the Court cannot find as a matter of law that the challenged sick leave policy is

inconsistent with business necessity.  Because there is record evidence demonstrating that abuse of sick leave has been a chronic problem in the Fire Rescue Department, the Court cannot rule, as a matter of law, that a policy that ensures  that fire fighters and paramedics do not violate sick leave policy is not a business necessity.  As stated by one court, violations of sick leave not only "drains[ ] public funds" but has the potential to "disrupt[ ] vital services."  <u>See</u> <u>Transport Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.</u>, 341 F. Supp. 2d 432, 448 (S.D.N.Y. 2004).

For the foregoing reasons, the Court denies Plaintiff's motion for partial summary judgment.

<u>IV.  Conclusion</u>

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)      Defendant's Motion for Summary Judgment (DE 28) is **GRANTED**.

2)      Plaintiff's Motion for Partial Summary Judgment (DE 60) is **DENIED.**

3)      Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, the Court will consider a judgment independent of the motion with respect to the disparate impact claim. In light of the new discovery the parties have engaged in on this issue (DE 89), the Court will permit the parties to respond as to whether summary judgment should be entered on behalf of Defendant on the disparate impact claim.  The parties should

file any materials and legal memoranda they wish for the Court to consider **no later than 30 days from the date of entry of this Order.**

    **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 23rd day of January, 2014.

                                                        _____
                                                        KENNETH A. MARRA
                                                        United States District Judge

24